## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                   No. CR 05-801 JB

ERNEST FRED,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Ernest Fred's Motion to Suppress Statement, filed October 13, 2005 (Doc. 24). The Court held an evidentiary hearing on the motion on April 14, 2006. The primary issues are: (i) whether Federal Bureau of Investigation ("FBI") Special Agents Devon Mahoney and Robert Sayegh interviewed Fred in a custodial setting, thereby triggering the requirement that he be advised of his constitutional rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966); and (ii) whether the admission of statements made by Fred during this interview would constitute criminal trial use against Fred of involuntary statements in violation of due process of law. Because the Court concludes that Fred was not in custody, and that the agents' interview was not a custodial interrogation, Miranda warnings were not necessary. And, because the Court further finds that Fred's statements were not the product of coercion, and thus were voluntary, introduction of such statements is not a denial of Fred's due process. The Court will deny the motion to suppress.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. The findings of fact in

this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the Court is not bound by the rules of evidence except for those rules related to privileges. See Fed. R. Evid. 1101(d)(1). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269.

1. Fred learned that his daughter was in the custody of Social Services and that she had made allegations accusing him of touching her in a sexual manner. See Transcript of Hearing at 95:2-6 (taken April 14, 2006) (Barbara McClanahan) ("Transcript") at 95:2-6.[1]

2. On or about December 8, 2004, Fred voluntarily arrived at the FBI office accompanied by his wife, Barbara McClanahan. He had not been called in for questioning and did not have an appointment. See id. at 8:11-24 (Devon Mahoney).

3. On or about December 8, 2004, FBI Special Agents Devon Mahoney and Robert Sayegh interviewed Fred at the FBI office in Gallup, New Mexico. See Defendant's Motion to Suppress Statement, ¶ 1, at 1 ("Motion to Suppress").

4. Fred was interviewed in a conference room at the FBI office. Fred and the two agents were the only individuals present in the conference room. The agents' weapons and badges were visible during the interview. Fred was seated with his back to the door of the conference room which

---

[1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

remained partially ajar.  See Transcript at 9:19-20, 12:19-20, 29:1-5, 48:4-8 (Mahoney).

5.  Before being questioned by the agents, Fred was told that he was free to leave at any time.
See id. at 12:23 - 13:3.

6.  Fred was not handcuffed or otherwise physically restrained at any time during the
interview.  At the conclusion of the interview, Fred left the FBI office.  See id. at 11:20-21.

7.  Fred was not in custody during his interview with Special Agents Mahoney and Sayegh.
See id. at 12:21 - 13:14.

8.  The agents did not record the interview.  See id. at 25:9-11.

9.  At no time during the interview did the agents advise Fred of his Miranda rights.  See id.
at 40:4-7.

10.  The agents did not make any promises to Fred or threaten him in any manner.  See id.
at 11:22-25.

11.  Fred was not improperly coerced to speak.  See id. at 11:18-25.

12.  Fred knowingly and voluntarily made statements in the interview.  See id. at 11:9-12.

11.  During the interview, Fred made statements confessing that he had inappropriate sexual
contact with his minor daughter.  See id. at 16:15-17.

12.  At the conclusion of the interview, Fred signed a written statement prepared by Special
Agent Mahoney acknowledging the substance of his statements made during the interview.  The
statement was titled "Written Statement" and labeled "Non-Custodial" beneath the title.  See id. at
18:4-6, 23:21-22.

## PROCEDURAL BACKGROUND

On April 12, 2005, a federal grand jury indicted Fred, charging him with two counts of Aggravated Sexual Abuse with Children in Indian Country, in violation of 18 U.S.C. §§ 2241(c), 2246(2)(D), and 1153.  See Indictment of Ernest Fred, filed April 12, 2005 (Doc. 1).  On October 13, 2005, Fred  moved to suppress statements he made to Mahoney and Sayegh during the agents' investigation of the crimes with which Fred is now charged.  Specifically, Fred seeks to suppress the confession he made to Mahoney and Sayegh during an interview at the FBI office in Gallup, New Mexico on or about December 8, 2004.

The United States requested that the Court hold a hearing before trial, and after reviewing the briefing on the motion, the Court agreed that Fred's allegations about the circumstances surrounding his confession required an evidentiary hearing.  At the hearing on April 14, 2006, the United States called Mahoney to testify, and Fred called his wife, McClanahan.

## LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily.  See Dickerson v. United States, 530 U.S. 428, 433 (2000)("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.") (citing Brown v. Mississippi, 297 U.S. 278 (1936), and Bram v. United States, 168 U.S. 532, 542 (1897));  Jackson v. Denno, 378 U.S. 368, 376 (1964)("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole

or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction." (citations omitted)).

The Supreme Court of the United States has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." Jackson v. Denno, 378 U.S. at 376-77 (citation omitted). The United States must show that the statement was voluntary by a preponderance of the evidence. See Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004); Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary." (citation omitted)), reh'g denied, 87 F.3d 1136 (10th Cir. 1996).

The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. at 434 (internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Id. (internal quotations omitted)(citations omitted). The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing." Id. (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)). The Supreme Court has reaffirmed this analysis as recently as 2000. See id. ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986).  In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct." Id.  The Supreme Court has made clear that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Id. at 165. The Supreme Court has explained that any other rule " would expand our previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." Id.  at 165-66.

### RELEVANT LAW REGARDING PREADVISEMENT

Law enforcement must give the four Miranda warnings only to a person subject to "custodial interrogation." United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(citing Miranda v. Arizona, 384 U.S. at 444)(internal quotations omitted).  A person is in custody if "his freedom of action is curtailed to a degree associated with formal arrest." Id. (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984))(internal quotations omitted).  The Court must examine "whether a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest." Id. (alteration in original)(internal quotations and citations omitted).

The Tenth Circuit has articulated the "[t]wo discrete inquiries . . . essential to the determination" of custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty

to terminate the interrogation and leave." United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).

### 1.  Custodial Setting.

The Supreme Court has described the determination whether a suspect is "in custody" as a "mixed question of law and fact." Thompson v. Keohane, 516 U.S. 99, 101 (1995).  Because of its nature as a mixed question, and because "[t]he Miranda decision did not provide the Court with an opportunity to apply that [custody] test to a set of facts," Yarborough v. Alvarado, 541 U.S. 652, 661 (2004), the resolution of this question requires a case-by-case analysis.  In making a custody determination, courts must consider a wide array of "diverse and case-specific factors in an effort to gain an overall sense of the defendant's situation at the time of the interrogation."  Thompson v. Keohane, 516 U.S. at 118 (Thomas, J., dissenting).

> These factors include, at a minimum, the location, timing, and length of the interview, the nature and tone of the questioning, whether the defendant came to the place of questioning  voluntarily, the use of physical contact or physical restraint, and the demeanor of all of the key players, both during the interview and in any proceedings held in court.

Id.  See Yarborough v. Alvarado, 541 U.S. at 664-65 (outlining factors for and against a custody determination).  In reaching a conclusion, none of these factors is dispositive, and the underlying emphasis is always on the degree to which the suspects' freedom has been curtailed.  See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.  Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'").

Courts employ an objective test is making custody determinations and therefore "the only

relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. at 442.  See Stansbury v. California, 511 U.S. 318, 323 ( 1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").  The Supreme Court has indicated that it favors an objective test, as opposed to a subjective test, because an objective test "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question." Berkemer v. McCarty, 468 U.S. at 442, n.35 (quoting People v. P., 21 N.Y.2d 1, 9-10, 233 N.E.2d 255, 260 (1967)).

Pursuant to this understanding, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have held that an individual is not "in custody" for Miranda purposes simply because the individual is the target of an investigation or a suspect in a crime.  See, e.g., Stansbury v. California, 511 U.S. at 319 ("We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody."); United States v. Leach, 749 F.2d 592, 599-600 (10th Cir. 1984) (refusing to classify defendant as "in custody" merely because he was the target of a counterfeit note investigation).  For an individual's status as a suspect to be relevant, the questioning officer must convey his knowledge or belief with regard to that status, by word or deed, in such a manner as to "affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'"  Stansbury v. California, 511 U.S. at 325.

### 2.  Custodial Interrogation.

A finding of custody, by itself, does not make a statement inadmissible.  The Supreme Court in <u>Miranda v. Arizona</u> specifically preserved the propriety of confessions in American law enforcement and stated:  "Any statement given freely and voluntarily without compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."  <u>Miranda v. Arizona</u>, 384 U.S. at 478.  Accordingly, custodial statements are only inadmissible when they are improperly compelled or coerced through either "express questioning or its functional equivalent." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  In other words, it is not custody that requires <u>Miranda</u> protections, but rather custodial interrogation.  <u>See id.</u> at 300 ("'Interrogation,' as conceptualized in the <u>Miranda</u> opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.").

It is well settled that "<u>any</u> criminal trial use against a defendant of his <u>involuntary</u> statement is a denial of due process of law." <u>Mincey v. Arizona</u>, 437 U.S. 385, 398 (1978) (emphasis in original).  While some statements procured while a defendant is in custody may be the product of involuntary coercion, many are attributable to other factors.  <u>See</u> <u>Culombe v. Connecticut</u>, 367 U.S. 568, 576 (1961) ("[A] confession made by a person in custody is not always the result of an overborne will.  The police may be midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation.").  Similar to the custody test, the determination whether a statement is voluntary or involuntary involves a totality of the circumstances approach requiring "more than a mere color-matching of cases," <u>Mincey v. Arizona</u>, 437 U.S. at 401 (quoting <u>Reck v. Pate</u>, 367 U.S. 433, 442 (1961)), but rather a "careful evaluation of all the circumstances of the interrogation." <u>Mincey</u>

v. Arizona, 437 U.S. at 401.

To assist the courts' efforts in determining whether a statement was voluntarily given, the Supreme Court has divided the analysis into three parts.  First, the court must compile the facts relevant to understanding the circumstances under which the confession was given.  See Culombe v. Connecticut, 367 U.S. at 603.  Among the facts the court must consider in this step are "the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance and self-control."[2]  Id. at 602.  Second, the court must evaluate how the accused reacted to these underlying circumstances.  See id. at 603.  Third, the court must determine the legal significance of the accused's reaction to the circumstances.  See id.  With reference to the second and third parts of the analysis, the Supreme Court has acknowledged that "although distinct as a matter of abstract analysis, [parts two and three] become in practical operation inextricably interwoven."  Id. at 604.

## ANALYSIS

Based on the evidence presented at the hearing, after being made fully aware of the facts, and

---

[2]The Tenth Circuit has recently enumerated its own list of facts relevant to a determination whether a statement was voluntarily made.  In United States v. Lopez, 437 F.3d 1059 (10th Cir. 2006), the Tenth Circuit stated:

> Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation.  Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.

Id. at 1063-64 (quoting United States v. Toles, 297 F.3d 959, 966 (10th Cir. 2002)).

given the totality of all the relevant circumstances, the Court finds that Fred was not in custody during his interview with Mahoney and Sayegh, and therefore was not entitled to pre-advisement of his constitutional rights.   The Court also finds that Fred was not improperly coerced to speak, and knowingly and voluntarily made the confessional statements attributed to him.

I.      **THE AGENTS DID NOT INTERVIEW FRED IN A CUSTODIAL SETTING.**

After a full hearing, the evidence indicates that the facts do not support Fred's motion to the extent that it contends he was in custody at the time of his interview with Mahoney and Sayegh.  In reaching a custody determination, the Court must consider the factual record to ascertain an overall sense of Fred's situation at the time of his interview with the FBI agents and then draw a conclusion whether a reasonable person in Fred's position would have understood himself to be in custody during the interview.

In United States v. Leach, 749 F.2d 592 (10th Cir. 1984), the Tenth Circuit did not find custody over a confessor in circumstances similar to those involving Fred and therefore held that the district court's denial of a motion to suppress was proper.  Leach, the defendant in United States v. Leach, was an individual being investigated by the FBI and Secret Service for the alleged production and passage of counterfeit notes.  In response to an initial telephone call placed to him by one of the government agents, Leach volunteered to be interviewed by the agent at the agent's convenience and with full knowledge that the substance of the interview was to relate to the counterfeit bills.  See id. at 599.  Throughout the course of the interview, which took place in the office of the United States Attorney, Leach was never arrested, restrained, or told that he was not free to leave.  See id.  Under these circumstances, the Tenth Circuit held that the district court's finding that Leach was not in custody when he spoke with the agents, and therefore not entitled to Miranda protections, was not

-11-

clearly erroneous.  See id. at 600.

A perhaps even more compelling result is embodied by the Supreme Court's refusal to classify a defendant as being in custody in Yarborough v. Alvarado, 541 U.S. 652 (2004).  In that case, Los Angeles police called respondent Alvarado in for an interview following Alvarado's and a companion's attempt to steal a truck, leading to the death of the truck's owner.  See id. at 656. Alvarado's parents took Alvarado, who was seventeen-years old at the time, to the police station, but were required to wait in the lobby of the station while one detective interviewed Alvarado in a small private room.  See id.  Over the course of a two-hour interview, Alvarado originally denied involvement in the death of the truck owner, and then eventually confessed to participating in the incident.  See id. at 657-58.  He was not arrested, and at the conclusion of the interview, the police returned him to his parents and allowed him to be driven home.  See id. at 658.

Similar factors counsel a finding that Fred was not in custody when Mahoney and Sayegh interviewed him.  Like both Leach and Alvarado, Fred responded to a request by law enforcement officials to meet for an interview.  Law enforcement officials did not transfer Fred to the FBI office in Gallup, and he was not required to be there at any particular time.  The interview took place– not in an interrogation room– but in a conference room that FBI personnel used, and the door to the conference room remained slightly ajar.  Significantly, the officers told Fred that he was free to leave at any time, he was not handcuffed or placed under arrest, and at the conclusion of the interview– which lasted approximately one and a half to two hours– he was allowed to leave with his wife. Finally, the written statement that Fred eventually signed was labeled "Non-Custodial," a designation

Fred presumably understood based on his established degree of education and literacy.[3]

The Court declines to view certain factual circumstances related to the interview that Fred contests tend to support the conclusion that he was in custody, as overcoming the results that the Supreme Court reached in Alvarado v. Yarborough or that the Tenth Circuit reached in United States v. Leach. First, agents whose weapons and badges were visible interviewed Fred in an FBI office. Alvarado was interviewed in an interrogation room of a police station, where presumably some if not all of the officers were armed, and individuals whom Leach knew to be federal law enforcement agents interviewed him in the United State's Attorney's office. Second, Fred's wife, who accompanied him to the FBI office, was denied the ability to be present at the interview, a fact that might have made him feel inhibited. Alvarado's parents, however, had driven him to the police station to be interviewed and were likewise rebuffed. Finally, Social Services had notified Fred that his daughter had accused him of touching her inappropriately and understood that the subject of his conversations with the FBI officers could be those potentially criminal accusations. Similarly, both Alvarado and Leach were aware why law enforcement had contacted them and what the subject of their interviews would be before submitting to questioning.[4]

---

[3]Fred's wife, McClanahan, testified that Fred spoke English well and that he had graduated from public high school in Gallup. See Transcript, at 89:13-23. It is Fred's understanding of the term "Non-Custodial," and not the label itself, that supports the conclusion that Fred was not in custody. Custody determinations rely on an objective test, and "are not solely dependent either on the self-serving declarations of the [law enforcement] officers or the defendant." Berkermer v. McCarty, 468 U.S. at 442, n.35 (quoting People v. P., 21 N.Y.2d 1, 9-10, 233 N.E.2d 255, 260 (1967)).

[4]In considering the factors counseling for and against a finding of custody, the Court notes that it is irrelevant whether Mahoney had identified Fred as under suspicion for the underlying crime being alleged. The Supreme Court has held that, unless a law enforcement officer conveys his suspicions to a defendant in such a manner as to evince a reasonable understanding that the individual's freedom of action has been curtailed, a defendant may not use his status as a suspect to establish custody. See Stansbury v. California, 511 U.S. at 319.

## II.    THE CONFESSIONAL STATEMENTS MADE BY FRED WERE OFFERED VOLUNTARILY UNDER RELIABLE AND APPROPRIATE CIRCUMSTANCES.

Fred contends that law enforcement officers violated his constitutional rights by eliciting an involuntary confession through coercion.  Under the totality of the circumstances, however, Fred's statements were given freely and knowingly.  Neither the oral confession made to FBI agents or the written statement signed by Fred was made involuntarily or because of promises, duress, or coercion.

The first step in analyzing whether a statement was voluntarily given is to compile all of the facts relevant to understanding the totality of the circumstances under which the statement was given.  See Culombe v. Connecticut, 367 U.S. at 603.  This step embraces "both the characteristics of the accused and the details of the interrogation."  United States v. Lopez, 437 F.3d at 1063-64.  With respect to Fred, there does not seem to be any evidence that he was particularly susceptible to coercion because of age, intelligence, or education.  Indeed, Fred's wife, McClanahan, testified that he speaks English well, graduated from a public high school in Gallup, and is sophisticated enough to build homes.  See Transcript at 90:19-21.  McClanahan also testified that Fred had been brought up in a traditional Navajo lifestyle, but offered no indication that this would preclude Fred from understanding the agents' questions or make him especially vulnerable to solicitous interrogation.  See id., at 91:6-10.  Finally, McClanahan testified that, on the day of the interview, Fred was not under the influence of any drugs or alcohol, and was of a "clear mind."  Id. at 97:2-7.

McClanahan testified  that, at the time of the interview with the special agents, Fred was emotionally distraught over his inability to locate his daughter for the previous several days.  See id. at 78:13-15.  Although the Court acknowledges the stress which this predicament must have caused Fred, by the time of the interview with the agents, Fred and his wife had learned that Fred's daughter was in the custody of social services.  See id. at 78:7-12.  Because her whereabouts and physical

-14-

safety were no longer unknown to Fred, this stress cannot sustain a claim that Fred was too emotionally upset to resist coercion or interrogatory pressure.  Moreover, McClanahan testified that, immediately after emerging from the interview with Mahoney and Sayegh, Fred looked tired, but was not visibly upset and was not crying.  See id. at 98:24 - 99:7.

Nor can Fred contend on good grounds that the details of the interrogation were improperly coercive.  The FBI agents did not demand to see him at a specific time and place.  He was interviewed in a conference room typically used by FBI agents and staff (as opposed to a custodial interrogation room), and the door to the conference room remained partially ajar throughout the interview.  The interview was conducted by only two officers and was not recorded.

At no time was Fred physically handled, handcuffed, or otherwise restrained.  While the agents did challenge the veracity of some of Fred's statements, they did not threaten him, pressure him, or improperly suggest that he cooperate with them against his will.  Indeed, during cross examination of Mahoney, Fred's counsel stated that Mahoney had been "pleasant" with Fred and suggested that being pleasant with interviewees was part of Mahoney's style.  Id. at 27:24-25.  McClanahan's testimony is also consistent with the Court's conclusion that Mahoney was firm but appropriate on the day Fred was interviewed.  On cross-examination, McClanahan expressed her disappointment that she was not able to accompany Fred during the interview, but conceded that Mahoney was not rude in preventing her from doing so.  See id. at 95:20-21.

Once the facts relevant to the circumstances of the interview are compiled, a court must evaluate the accused's reaction to those circumstances and determine the legal significance of that reaction.  See Culombe v. Connecticut, 367 U.S. at 603.  Although these remain two distinct steps in theory, the Supreme Court has acknowledged that, in practice, they become inextricably

-15-

intertwined. See id. at 604.  Fred confessed to inappropriate sexual touching of his daughter in a non-custodial setting under questioning that did not rise to the level of inappropriate coercion.  At no time did Fred lose his composure or speak against his will. Under these circumstances, the Court does not consider Fred's statements the product of duress or compulsion, and therefore determines them to be voluntary and admissible.

The statements are admissible.  The Court will not suppress or limit for use in the trial any statements allegedly obtained from Fred.

**IT IS ORDERED** that the Defendant's Motion to Suppress Statement is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
   United States Attorney for the
      District of New Mexico
Kyle T. Nayback
   Assistant United States Attorney for the
      District of New Mexico
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

John F. Moon Samore
Albuquerque, New Mexico

*Attorney for the Defendant*